Nashville Water Co., Inc., *v.* Dunlap *et al.*

(*Nashville*, December Term, 1939.)

Opinion filed April 6, 1940.

80

CORNELIUS, McKINNEY & GILBERT, of Nashville, for complainant.

LON P. McFARLAND, of Lebanon, Counsel, Railroad and Public Utilities Commission, for defendants.

MR. SPECIAL JUSTICE EDWARD J. SMITH, delivered the opinion of the court.

This is an appeal by the Railroad and Public Utilities Commission from a decree enjoining it (1) from assessing for State, county, and city *ad valorem* taxes, or

(2) from attempting to regulate in any way the Nashville Water Company.

Code, section 1508, provides: "The railroad and public utilities commission, hereinafter called the commission, are authorized and directed to assess for taxation, for State, county and municipal purposes, all of the properties of every description, tangible and intangible, within the State, belonging to the following named persons, hereinafter referred to as companies, namely: (1) railroads; (2) telephones; (3) telegraphs; (4) sleeping cars; (5) freight cars; (6) street cars; (7) power, whether hydro-electric, steam, or other kinds, for the transmission of power; (8) express; (9) pipe lines; (10) gas companies; (11) electric light companies; (12) motor bus and/or truck, and (13) water companies. The commission shall assess all of said property biennially in even years at its actual cash value as of the same date the properties of other persons are by law assessed; provided this statute shall not apply to corporations organized under the laws of Tennessee whose principal business is the manufacture of products of the soil of Tennessee and who for the transportation alone of such products furnish their own cars."

The Nashville Water Company was incorporated as a domestic corporation on November 27, 1936, with an authorized capital stock of $1,000.000.

The charter which is in the usual form prescribed for water and water works' companies, by Code sections 4066-4075, contains, under the heading "Special Powers," the following:

"The corporation shall have the following special powers:

"(1) To act as, maintain and conduct a water and waterworks company, and to do all things and carry on

any business or businesses necessary to or incidental to the operation of such a company.

"(2) The corporation shall be empowered to engage in building, buying, maintaining, leasing, owning and/or operating pipe lines or water mains and/or giving, selling or leasing water rights, taps or connections therefrom.

"(3) To construct, lay or acquire by purchase water pipe line systems; to acquire water by purchase, development or otherwise; to construct reservoirs or water towers; erect pumping machinery; to lay water mains, pipes, gates, valves and hydrants; to furnish and sell water to manufactories, private corporations and individuals for fire protection, manufacturing and domestic use; to collect payments, rentals or pumping charges for the furnishing of said water.

"(4) The corporation is also vested with all the powers set out in Sections 4066-4075 of the Code of Tennessee of 1932."

Section 4067 confers the power of eminent domain.

On January 10, 1938, the company, in obedience to an order issued by the Railroad and Public Utilities Commission, filed a statement showing the properties owned and operated by it, although it denied the jurisdiction of the Commission to assess it for taxation.

It appears that the company had purchased from four or five different concerns pipe lines which had been constructed by them as real estate development companies, and that on January 10, 1938, it owned 78 miles of water mains of an estimated value of $570,000.

It also owned and operated 4 motors, and 2 steel and 1 concrete reservoirs, with an aggregate capacity of 335,000 gallons of water, and other real and personal property.

The total admitted assets of the company were $629,-190.83, and its secretary stated that its property for purposes of taxation had a value of $390,000.

It is conceded that the company did no business of any kind or character except such as is authorized by its charter.

It appears that many years ago certain individuals and corporations, for the purpose of developing subdivisions in the neighborhood of Nashville, obtained permits from Davidson County to lay pipe lines from the city limits, and that taps were sold to purchasers of lots at varying prices, the purchaser paying for the laterals which he was required immediately to transfer to the seller.

When the Nashville Water Company was chartered on November 27, 1936, many such taps had been made on the lines of the persons and corporations, the properties of which it acquired, but since its incorporation it has made various extensions, for which it has applied for and received permits from Davidson County, and the State Highway Department, and it has required, as did its predecessors, the parties, seeking to use its water mains, to pay for the taps, and also the cost of the lateral lines which are at once transferred to the company, and become its property.

Water is furnished to all consumers directly by the City of Nashville who pay the bills directly to the city, and the company receives no profit either from the city or the consumers for the water so furnished, and further the company does not charge the city for using its water mains from the city limits for water service.

Due to the topography of some parts of the territory, the water pressure is insufficient adequately to serve about four hundred customers or about twenty per cent of those who have water taps on the mains of the company, and

to secure the needed pressure the company owns and operates three reservoirs equipped with motors which pump the water from the mains into the reservoirs from which by gravity it is furnished to the customers.

An annual charge of $12 for each customer is made for this service.

The company moreover keeps the mains, both trunk and lateral, in good condition of repair at its own expense, but it does not appear that it makes any separate charge for this service.

The contention of the company that it is not subject to taxation as a water company is tersely but aptly illustrated by the following question and answer:

"Q. Mr. Sheftall, your company is incorporated as a water company, I believe you say it is? A. That I can't very well answer. It is neither a water company nor a pipe line company, it is in between, we don't know what it is. I will be perfectly frank with you, I have read the description of a pipe line company, and that certainly does not apply; and I have read what constitutes a water company, and that does not apply, and we are neither one really in my opinion."

It is, of course elementary that before private property can be held "to be affected with a public use" it must be dedicated by some act of the owner which may be evidenced by his declarations or acts, but in no more convincing and unequivocal manner can a dedication be made than by the acceptance of a charter which confers powers and prescribes duties which could not be conferred or prescribed except in the interest of the public.

It is everywhere agreed that the right to lay pipes in public highways is itself a franchise, and that the right of eminent domain cannot be conferred except for taking private property for a public use, and for these

two reasons among others water and water works companies have always been held to be public utilities. 27 R. C. L., section 4, p. 1386.

▮ The charter conferring such powers and imposing such duties is itself a public profession, and when it is accepted it becomes of binding force, and must be taken with all its conditions, and burdens, as well as its privileges. It cannot be accepted in part, but must be taken as a whole.

In 1 Wyman on Public Service Corporations (1911), section 212, the law is stated thus:

"The beginnings of the modern law of public service are to be found in those cases just before the middle of the nineteenth century, in which it was held that although there was no express provision in chartering a supply company compelling it to serve the public, the situation was such that even where its character was permissive, the obligation was assumed. In the leading case of *Lumbard* v. *Stearns*, 4 Cush. [Mass., 60], 61 (1849), Chief Justice SHAW with characteristic insight held that a water company enjoying privileges under a permissive charter must give public service. 'By accepting the act of incorporation,' he said, 'they undertake to do all the public duties required by it.' And indeed it is now well-accepted doctrine that the very acceptance of a charter providing for the carrying on of a business public in character is a sufficient profession in the particular case."

In note two, the author cites many cases, federal and State, in support of the text, among them, *Watauga Water Co.* v. *Wolfe* (1897), 99 Tenn., 429, 41 S. W., 1060, 63 Am. St. Rep., 841.

To the same effect are Collier Public Service Companies (1918), sec. 107, p. 220, *Olmsted* v. *Proprietors of Morris Aqueduct*, 47 N. J. L., 311, 331, *Haugen* v. *Light*

& *Water Company*, 21 Or., 411, 28 P., 244, 14 L. R. A., 424, *Weymouth* v. *Penobscot, etc., Co.*, 71 Me., 29.

As the company is endowed by the charter with all the rights and privileges of a public utility, the fact that it has not wholly exercised these powers and privileges, cannot legally change its character.

If it made a contract directly with the City of Nashville to furnish water, which it in turn distributed to its consumers, as it undoubtedly has the power to do, it would not be seriously contended that it was not a public utility, or if the City of Nashville should change its policy and decline to furnish water to parties living beyond the city limits, it is clear that such a duty would rest on the company, and if it failed to discharge its charter duty in this regard, it would subject itself to a *quo warranto* proceeding.

It has the unquestioned power to exercise the right of eminent domain, and, if it should institute proceedings for such a purpose, those whose property it sought to take could not question its authority.

As was stated in *Weymouth* v. *Penobscot, etc., Co., supra*, a corporation, endowed with privileges to be exercised for the public benefit cannot escape the performance of its duties to the public by picking and choosing certain charter provisions, which it deems beneficial to it, and failing or refusing to exercise others, which it may deem onerous and nonprofitable.

Its acceptance of the charter is a voluntary act, and so long as it operates under it, it cannot claim that its properties are not affected by a public use.

As has been stated, the Nashville Water Company does not operate as a real estate development company as did its predecessors in title, but according to its secretary carries on only the business authorized by its charter,

and this being so, cases of the type of *Shinkle* v. *Nashville Improvement Co.*, 172 Tenn., 555, 559, 113 S. W. (2d), 404, *Cohen et al.* v. *Bransford Realty Co.*, *et al.*, decided by the Court of Civil Appeals in 1920, *certiorari* denied by this court 1921, *State ex rel.* v. *Public Service Commission*, 275 Mo., 483, 205 S. W., 36, 18 A. L. R., 754, annotation, *Clark* v. *Olson*, 177 Wash., 237, 31 P. (2d), 534, 93 A. L. R., 240, annotation, *Overlook Development Co.* v. *Public Service Commission et al.*, 306 Pa., 43, 158 A., 869, 872, and other cases of like character are not in point, as the questions presented arose with reference to the mere incidental and subordinate use of water or pipe lines in real estate development projects, or the sale of a by-product of the corporation.

As the company by virtue of the provisions of its charter is a public utility, it is subject to be taxed by the Railroad and Public Utilities Commission under Code, section 1508, and to be regulated under section 5448.

It results that the decree of the Chancellor is reversed, and the bill dismissed, at the cost of the appellee.